# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

BIGFOOT ON THE STRIP, LLC,    )
         )
        Plaintiff,    )
         )
    v.    )        No. 18-3155-CV-S-BP
         )
RANDY WINCHESTER and    )
EMILY WINCHESTER,    )
         )
        Defendants.    )

## ORDER AND OPINION GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges that Defendants published false and defamatory statements on two websites and in an interview with a newspaper reporter. It asserts claims for libel, negligence, and tortious interference with business expectancy. Pending is Defendants' Motion for Summary Judgment, (Doc. 149), which is **GRANTED.**

## I. BACKGROUND

The Court will set forth material facts that are uncontroverted or, where controverted, in the light most favorable to Plaintiff. The Court will not set forth immaterial facts. Citations to the Record will not be provided for facts agreed to by the parties. Citations also will not be supplied where (1) only an inconsequential component of a fact has been controverted, (2) when an obvious typographical error is the sole basis for the disagreement, or (3) an objection is based on a party repeating a fact that was established elsewhere in another statement without re-establishing that fact.

This suit has its genesis in a mediocre customer review. Plaintiff is an entertainment venue in Branson, Missouri. Patrons pay fees to play miniature golf, play arcade games, and participate

in other interactive experiences. Darrell Henley and Emma Hamilton are two of Plaintiff's three managing members.

In late Fall of 2017, Plaintiff started offering a "tour" that has been referred to as a "scenic farm tour," but Henley testified that it did not have a specific name. (Doc. 150-3, p. 55 (Henley Dep., p. 54).)[1] This tour lasted eighty to ninety minutes. The trucks used to carry guests on the tour were referred to as "safari trucks." Plaintiff was working on eventually unveiling a "Bigfoot Discovery Expedition Tour" bearing that name. The Bigfoot Discovery Expedition Tour was not available until June 2018 (after the time relevant to this suit), but promotional material about it existed at the time relevant to this suit, including on Plaintiff's website. The promotional material did not indicate that the "Bigfoot Discovery Expedition Tour" was different from the unnamed tour that was offered starting in the Fall of 2017. (Doc. 150-3, pp. 55-58 (Henley Dep., 54-57); Doc. 150-8, p. 103 (Hamilton Dep., p. 102).) Once it opened, the Bigfoot Discovery Expedition Tour traveled the same route as the unnamed tour and cost the same price.

Henley is a member of the Heartland Highland Cattle Association, ("HHCA"), an educational association that promotes and educates the public about Highland cattle. HHCA's members are, generally, farmers that farm and raise Highland cattle. HHCA was scheduled to have a meeting or convention in Branson in March 2018. In advance, in December 2017, Gloria Asmussen of the HHCA contacted Henley about hosting members of the HHCA for the "safari" that Plaintiff was offering at the time and to find out what price would be charged. Henley responded by stating that if everyone went as a group he could agree to charge $10 a person if everyone agreed to tip the driver an additional couple of dollars, and if this was acceptable he

---

[1] Unless otherwise specified, all page numbers are those generated by the Court's CM/ECF system and may not correspond to the document's original pagination.

would put Asmussen in touch with Hamilton. Asmussen responded to confirm the $10/person charge and to determine an appropriate tip because HHCA intended to cover it. Henley responded via email, with a copy to Hamilton, saying that $10/person and a tip of $2/person would be agreeable.

In January 2018, Asmussen emailed Hamilton to discuss how to promote the tour to HHCA's members. Asmussen indicated that she was "going to promote it as 'Bigfoot Safari Discovery Tour.['] You will be driven through Bigfoo[t] farms, a working Scottish Highland Cattle Farm. Experience authentic unspoiled Ozarks wilderness." (Doc. 150-4, p. 3.) Hamilton approved this description. Later, when asked who the checks should be made out to, Hamilton said that they should be written to "Bigfoot on the Strip."

Defendant Randy Winchester[2] paid HHCA forty dollars for four tickets for himself, his wife, his daughter Emily, and Emily's fiancé. The tip for the drivers was paid by HHCA, and there is no evidence that Defendants knew the amount of the tip. Altogether, seventy-three HHCA members went on the tour. Before departing, Hamilton met with the HHCA members "to tell them what they were going to be doing that day, and how it was different from what the Bigfoot Discovery Expedition was." (Doc. 150-8, p. 133 (Hamilton Dep., p. 132).) Those differences consisted of: (1) a different time of day for the tour than normal, (2) three trucks (instead of the typical one truck) would take tour members, and (3) the tour would spend more time at the cattle area than the normal ten minutes. (Doc. 150-8, pp. 126-29, 131 (Hamilton Dep., pp. 125-28, 130).) However, Hamilton did not go on the tour with HHCA and has no personal knowledge as to what happened on the tour. She testified that one of the drivers told her "they spent longer than normal with the cattle" but even that driver does not remember how long was spent with the cows. (Doc.

---

[2] Defendants have the same surname, so the Court will use their first names to avoid confusion.

150-8, pp. 128-30 (Hamilton Dep., pp. 127-29).) Regardless, these were the only differences that Hamilton related (and that apparently existed), (Doc. 150-8, p. 133 (Hamilton Dep., p. 132)); the tour traveled the same route as the regularly-offered tour and the drivers related Bigfoot legends to the HHCA members.

On March 4, 2018 – after the tour – Randy, Emily, or both drafted and posted the following review on Plaintiff's page on the internet review site TripAdvisor.com:

> We did the Bigfoot Safari tour as part of a large group. The $10 price tag is about right for what we got. Basically a tour through some pretty rugged country on some pretty narrow roads. They promote the fact they have the largest herd of Highland cows in the Midwest. You spend about 5-10 minutes feeding them range cubes at the beginning of the tour, and see maybe 10 of the cows. Then its off into the hills you go with a guide telling some pretty fanciful tales along the way. All in all a decent experience but had we paid more than the $10 I would have been disappointed.

(Doc. 65-1.) On a scale of one to five, the review rated the experience a three. The review indicates that it was made by "randy w."

Henley investigated to determine who left the review, primarily by reviewing HHCA's membership list for a person with the name of Randy and a last name that began with the letter "W;" in this way, Henley found the HHCA listing for "Randy or Emily Winchester" of "Dancing Cow Farms" in Wellsville, Kansas. A phone number and a website were included in the listing. Henley went to the Dancing Cow Farms website and found a phone number (which was the same as the number in the HHCA listing). The number is for a phone used by Emily for personal matters as well as for matters relating to Dancing Cow Farms.

Henley called the number and reached Emily. During the conversation, Emily referred to Randy as her father but refused to give Henley a number he could use to contact Randy directly. Henley asked Emily to have Randy call him. Approximately half an hour later, Henley found Randy's email address on the website LinkedIn and sent him the following email:

4

> Randy, I'd like to talk to you soon. You visited one of my farms while attending the Heartland Highland Cattle annual meeting in Branson. I'd like the opportunity to clear up any confusion and ask that you revise your very harmful Trip Advisor review where you reference $10 price.

The email concluded with Henley's cellphone number.

Two days later, Henley called the same number he called previously, but Emily did not answer the phone. Later that day, Henley looked for a phone number for Randy on the internet; he found a number (which happened to be Randy's home phone number) and called at 8:23 in the evening. Whether Randy answered the phone is not addressed by the parties. Three days after that, Henley called Emily at the same number he had used to reach her previously; once again, she did not answer the phone.

Approximately two hours after his last call to Emily, Henley sent an email to Emily addressed to her and Randy, with a copy to Asmussen. The email complains that the TripAdvisor review is libelous because Plaintiff "do[es] not have $10 tickets. That was something special that you received via the [HHCA]. You did not buy a $10 ticket directly from us, nor do we sell $10 tickets." (Doc. 150-20, p. 1.) The email also reacts to what appear to be prior statements from Emily or Randy during a phone conversation opining that Plaintiff does not operate a "real" cattle farm, explaining that Plaintiff "offer[s] a themed experience centered around a fictional character." (Doc. 150-20, p. 1.) The email also states that Plaintiff will be filing suit and, because Emily said something to Henley indicating that she wrote the review, Plaintiff "may have to name" her as a defendant. (Doc. 150-20, p. 1.)

At some point after receiving the email (but before the lawsuit commenced), Randy amended the TripAdvisor review. Apparently, amending a TripAdvisor review does not remove the original review; it either incorporates the original review or adds to it. The new information added by Randy states as follows:

Since posting the above review, a person identifying himself as an owner of Bigfoot on the Strip has called my daughter on her cellphone repeatedly, has contacted my daughter by email, has tried to call my home phone at 8:30 p.m. on a Saturday, has attempted to contact me by email, and has contacted the person who coordinated our tour, to complain about my original review. The "owner" has also advised my daughter by email that he and his partners would likely be suing both of us.

I have significant reservations regarding any business run by someone who seems to think it is an acceptable business practice to contact family members and associates of a reviewer because they seem to be unhappy with a review. Consequently, I am changing my three-star review to one star.

(Doc. 65-2.)

Plaintiff filed this lawsuit in state court on April 13, 2018. Approximately one month later, Randy initiated a personal campaign to raise funds to defend the lawsuit on the website FundedJustice.com. As part of the campaign, Randy posted a description of the tour and the events that occurred subsequently; most of his comments are similar to what has been recounted above. As relevant to the issues before the Court, this post contains the following additional statements:

In violation of Trip Advisor policy, on March 8, 2018 my daughter Emily received a call from someone saying they were the owner of Bigfoot on the Strip and that they need[ed] to talk with me regarding the review.

On March 13th my daughter spoke with the owner and informed him that she had nothing to do with the review and that he was violating Trip Advisor policy trying to contact me.

On May 3 our attorney sent a notice that we would offer to settle the matter to avoid costly litigation. There was no response.

This suit is based upon unfounded accusations and meant merely to punish me for stating an opinion and some facts on the online website Trip Advisor.

(Doc. 65-3.) Randy removed the posting on FundedJustice.com on May 30, 2018.

At an unspecified point in time, Emily was interviewed by a reporter from the Springfield News-Leader. She allegedly told the reporter that Randy wrote the review, that she did not know that Randy wrote the review, and only learned of the review when Henley called her. Her specific

statements are not reflected in the Record; in fact, there is no news article in the Record that quotes Emily.[3]

Some of TripAdvisor's guidelines are relevant to this suit. These guidelines state that TripAdvisor does not condone threats or bullying of reviewers, and if threats or bullying occur it will take action against the responsible party. Those guidelines also state that TripAdvisor strives to preserve reviewers' anonymity and to encourage all communications between businesses and reviewers occur via TripAdvisor's messaging system, but that "owners may not ask reviewers to remove a review via the messaging system, and harassment of reviewers is strictly prohibited." The guidelines also warn that a business might be able to identify a poster if the poster uses his or her first name and last initial and thereby might be able to contact a reviewer through other channels.

Plaintiff's Amended Complaint, (Doc. 65), contains five counts. Count III only seeks punitive damages and Count V only seeks injunctive relief; thus, those counts do not assert causes of action. Count I asserts a claim for defamation, Count II asserts a claim for negligence, and Count IV asserts a claim for tortious interference with business expectancy. Defendants seek summary judgment on several grounds, all of which are opposed by Plaintiff. The Court will not address all the parties' arguments because, for the reasons stated below, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims, making it unnecessary to address all of the arguments presented.[4]

---

[3] The Court takes judicial notice of an article in the Springfield News Leader about this lawsuit dated June 11, 2018 that appears to be the one at issue. (https://www.news-leader.com/story/news/local/ozarks/2018/06/12/family-sued-tripadvisor-review-bigfoot-themed-branson-attraction-receives-support/691042002/ (last visited August 13, 2019).) But this fact is not confirmed by the Record.

[4] One notable topic not addressed by the Court relates to Plaintiff's ability to prove damages. In large measure the Court agrees with Defendants' arguments, particularly those contending that Plaintiff's calculations depend upon speculation and hearsay. But, for the reasons stated, there is no need to discuss this issue.

## II.  DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). However, not all undisputed facts will justify summary judgment; as Rule 56(a) suggests, only undisputed *material* facts can do so. "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). This is significant because the parties dispute some facts that are not relevant in that (1) they are not relevant under the law governing Plaintiff's claims or (2) they are not relevant to the issues that persuade the Court that summary judgment is appropriate.

In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be *reasonably* drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985). "The nonmoving party is entitled to all reasonable inferences that may be drawn from the evidence but not to inferences that may only be drawn by resorting to speculation." *Williams v. City of Carl Junction, MO,* 480 F.3d 871, 873 (8th Cir. 2007) (cleaned up); *see also Hill v. Southwestern Energy Co.,* 858 F.3d 481, 487 (8th Cir. 2017).

## A. Count I – Defamation

### 1. Governing Law

Under Missouri law, a defamation claim has the following elements: "'1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation.'" *Cockram v. Genesco, Inc.,* 680 F.3d 1046, 1050 (8th Cir. 2012) (quoting *Missouri ex rel. BP Prods. N. Am. Inc. v. Ross,* 163 S.W.3d 922, 929 (Mo. 2005) (en banc)). The Court's decision turns on combinations of the second, fourth, and (in one instance) fifth elements.

A defamation claim requires that the statement be defamatory. This is a separate inquiry from whether the statement is "false," as *Cockram* and *Ross* (the Missouri Supreme Court case *Cockram* relied on) demonstrate by stating them as distinct elements, although a true statement is not defamatory as a matter of law. *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.,* 829 F.3d 576, 580 (8th Cir. 2016). Other cases are to the same effect. *E.g., Overcast v. Billings Mut. Ins. Co.,* 11 S.W.3d 62, 70 (Mo. 2000) (en banc); *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.,* 354 S.W.3d 234, 239 (Mo. Ct. App. 2011); *Ribaudo v. Bauer,* 982 S.W.2d 701, 704 (Mo. Ct. App. 1998). "[W]hether language is defamatory and actionable is a question of law." *Castle Rock,* 354 S.W.3d at 239; *Pape v. Reither,* 918 S.W.2d 376, 379 (Mo. Ct. App. 1996). "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with or dealing with him." *Henry v. Halliburton,* 690 S.W.2d 775, 779 (Mo. 1985) (en banc). "In determining whether a statement is defamatory, the words must be stripped of any pleaded innuendo and construed in their most innocent sense. . . . If a statement is capable of a nondefamatory meaning, and can be reasonably construed in an innocent sense, we must hold

9

the statement nonactionable as a matter of law." *Castle Rock,* 354 S.W.3d at 239; *see also State ex rel. Diehl v. Kintz,* 162 S.W.3d 152, 155 (Mo. Ct. App. 2005)

Next, if a defamatory statement has been made, it also must be false. "Under Missouri law, a statement is not considered "false" for purposes of defamation simply because it contains an erroneous fact. Rather, if a statement is essentially true, such that its divergence from the truth would have no different effect on the reader's mind than that produced by the literal truth, the statement is not actionable in defamation." *Cockram,* 680 F.3d at 1051 (quotation omitted). "A person is not bound to exact accuracy in his statements about another, if the statements are essentially true." *Thurston v. Ballinger,* 884 S.W.2d 22, 26 (Mo. Ct. App. 1994). "The test to be administered in evaluating the defense of truth is whether the challenged statement is substantially true. . . . A substantially true statement contains the same 'sting' as the truth, which means that the plaintiff's damage would have been the same irrespective of whether the defendant stated the truth or the substantial truth." *Nigro v. St. Joseph Med. Ctr.,* 371 S.W.3d 808, 818 (Mo. Ct. App. 2012); *see also Cockram,* 680 F.3d at 1051.

Relatedly, opinions cannot form the basis for a defamation claim. Whether a statement expresses an opinion or facts is a question of law that requires the Court to "examine the totality of the circumstances to determine whether the ordinary reader would have treated the statement as opinion." *Castle Rock,* 354 S.W.3d at 241; *see also Clinch v. Heartland Health,* 187 S.W.3d 10, 17-18 (Mo. Ct. App. 2006). Whether a statement is verifiable is an important consideration when determining if a statement is fact or opinion, but other factors to consider include the words employed, the facts surrounding the publication, and the circumstances in which they are made. *E.g., Henry,* 690 S.W.2d at 787-89; *Pape*, 918 S.W.2d at 382 n.4 ("'verifiability' has . . . emerge[d]

as the guiding consideration [but] the other factors in the totality of the circumstances test still retain some vitality.").

Finally, before applying the law to this case, the Court must determine which of Defendants' statements are at issue. Plaintiff asserts claims based on statements contained in both TripAdvisor reviews, the FundedJustice.com post, and Emily's statements to the newspaper. The Amended Complaint specifies the allegedly false statements from those publications. (*See* Doc. 65, ¶¶ 6-8, 10-11, 13-14.) In its response to Defendants' Motion for Summary Judgment, Plaintiff has declared that its defamation claim does not rest solely on the statements specified in the Amended Complaint. (*E.g.,* Doc. 163, p. 25 (responding to Defendants' Statement of Fact 64); Doc. 163, pp. 53-54 (listing allegedly defamatory statements).) However, precedent has firmly established that in a defamation action, the allegedly false statement must be specified in the complaint. "[T]he use of [i]n haec verba pleadings on defamation charges is favored in the federal courts because generally knowledge of the exact language used is necessary to form responsive pleadings." *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 699 (8th Cir. 1979) (citing cases); *see also Freeman v. Bechtel Const. Co.,* 87 F.3d 1029, 1031 (8th Cir. 1996) ("[U]nless the complaints set forth the alleged defamatory statements and identify the persons to whom they were published, [the defendant] is unable to form responsive pleadings."); *Holliday v. Great Atl. & Pac. Tea Co.,* 256 F.2d 297, 302 (8th Cir. 1958) ("In an action for slander or libel the words alleged to be defamatory must be pleaded . . . ."). While the Amended Complaint specifies the publications containing the allegedly defamatory statements, specifying the publication, alone, is insufficient to put the Defendants on notice of the claim asserted. The Amended Complaint specifies the

allegedly defamatory statements, and Plaintiff's claims can be based only on the statements specified in the Amended Complaint.[5]

## 2. The First TripAdvisor Post

The Amended Complaint alleges that the following statements in the first TripAdvisor review were false and defamatory:

- Defendants participated in the Bigfoot Discovery Expedition Tour/Bigfoot Safari Tour, ("the Tour"),

- "Defendants paid $10.00 to take the Tour,"

- The "'price tag' for the Tour is $10.00,"

- Customers on the Tour "spend about 5-10 minutes feeding" range cubes to the cattle, and

- "Customers who take the Tour 'see maybe 10 of the cows.'"

(Doc. 65, ¶¶ 6, 8.)  The Court will address each of these statements separately.

Plaintiff emphasizes that the "Bigfoot Discovery Expedition Tour" did not exist and Defendants did not go on it.  While this observation is correct, the first review does not state that Defendants went on the not-yet-opened "Bigfoot Discovery Expedition Tour" or even the "Bigfoot Discovery Expedition Tour/Bigfoot Safari Tour" as suggested by the Amended Complaint; it says that Defendants went on the "Bigfoot Safari Tour."  The review's actual statement is at least essentially true, given that (1) Asmussen (with Hamilton's approval) referred to it as the "Bigfoot Safari Discovery Tour" when promoting it for the HHCA, (2) Plaintiff has no particular name for this tour, and (3) the drivers discussed Bigfoot legends during the tour.

---

[5] In footnotes, the Court will briefly address these additional statements.  The discussion should not detract from the Court's primary holding: that the only statements at issue are those specified in the Amended Complaint.  The footnoted discussion is merely meant to demonstrate that the outcome would not likely be different even if Plaintiff had included the additional statements in the Amended Complaint.

The review states that "[t]he $10 price tag is about right for what we got" and "had we paid more than the $10 I would have been disappointed." The reviewer's statement that the tour they went on cost $10 per person is factually correct. The reviewer's statements that they thought the tour was worth $10 is an opinion that cannot support a defamation claim. To the extent that Plaintiff is contending that the statement is false because it suggests what Plaintiff normally charges, the review makes no representations about the tour's normal price. In addition, the Court is not persuaded that the statement was capable of diminishing Plaintiff's reputation or standing in the community.

Given the circumstances in which the statement is made, the review's statement about the amount of time spent feeding cows is readily understood as describing the reviewer's personal experience. Plaintiff contends the statement that tour participants spent five to ten minutes feeding cattle is false because the HHCA members spent ten to twenty minutes feeding cows. (*E.g.,* Doc. 160-7, pp. 18-19 (Henley Dep., pp. 68-69 (ten to twenty minutes)); Doc. 160-7, p. 44 (Henley Dep., p. 170 (fifteen minutes or more)); Doc. 160-13, p. 40 (Hamilton Dep., p. 156 ("they . . . spent longer than five to ten minutes feeding them")); Doc. 163-19, p. 3 (Krebbs Dep., p. 8 ("a good 15 minutes, at least,")); Doc. 163-20, p. 4 (Hannawalt Dep., p. 11 ("between, like, 12 to 15, 18 minutes . . . sometimes shorter, sometimes longer, somewhere around that 12 --")).) The reviewer's statement that s/he personally spent five to ten minutes feeding cows is within the time range first identified by Henley and is substantially the same as the other testimony. Thus, even if the reviewer's statement is not precisely correct to the minute, it is substantially true and thus not actionable, and the minimal difference in the time estimates is not defamatory.

Finally, Plaintiff contends that Defendants saw more than ten cows, but the citations to the Record provided by Plaintiff does not support this contention. Henley testified that approximately

13

twenty-five cows are maintained in a sixty-acre area. (Doc. 150-3, pp. 65-66 (Henley Dep., pp. 65-65).) This does not establish how many cows were present to be seen by Defendants when they arrived; Henley's testimony does not establish that all twenty-five cows were in sufficient proximity to be seen by Defendants. Asmussen, who was in the last of the three trucks, estimated that she saw "at least 20 cow-calf pairs," which (1) is more cows than what Henley, the owner of the property testified was on the property and (2) does not establish how many cows were around when Defendants were observing the cows. Similarly, one of the drivers testified that there was "in the ballpark of 30 or 40 [cows], maybe," (Doc. 150-11, p. 23 (Krebbs Dep., p. 22)), and another driver testified there were "[p]robably 20 to 30." (Doc. 150-10, p. 14 (Hannawalt Dep., p. 13.).) The first driver's testimony is also at odds with the owner's testimony, and neither driver's testimony establishes how many cows were present when Defendants were there. Regardless, the Court does not believe that the discrepancy in the number of cows renders the statement false, as the statement is substantially true. The Court also believes that the discrepancy is too minor to be capable of defaming Plaintiff.[6]

For these reasons, the Court concludes that the Record establishes that Defendants are entitled to summary judgment with respect to the first TripAdvisor post.

### 3. The Second TripAdvisor Post

As stated earlier, the second TripAdvisor post appears to add to the end of the initial post. Thus, while it arguably repeats the representations from the first TripAdvisor post the Court will not repeat its analysis of the allegedly defamatory statements that originally appeared in the first post. With that understanding, the new defamatory statements identified in the Amended Complaint are:

---

[6] While Plaintiff generally wishes to rely on statements other than those specified in the Amended Complaint, (*see* page 11-12, *supra*), the Court notes Defendant does not identify any additional statements from the first review.

14

- "A representative of Plaintiff called Defendant Randy's daughter 'on her cellphone repeatedly'" and

- "A representative of Plaintiff called Defendant Randy's 'home phone at 8:30 p.m. on a Saturday.'"

(Doc. 65, ¶¶ 7-8.)

The uncontroverted facts establish that Henley – one of Plaintiff's owners – called Emily's cellphone three times in six days. These facts are not changed with the addition that Emily also used her cellphone in connection with her father's farm's business. And, characterizing three calls in six days as "repeated[ ]" is an opinion that is not actionable. Similarly, Henley called Randy's home phone on March 10, 2018 – and the Court takes judicial notice of the fact that this was a Saturday. Henley called at 8:23 p.m. – the fact that this was seven minutes before the 8:30 time set forth in the second review is an inconsequential difference that does not render the statement false.[7]

### *4. The FundedJustice.com Post*

Randy's post on FundedJustice.com includes some of the statements discussed above, and the Court will not repeat its analysis of those statements. The new allegedly defamatory statements appearing in the FundedJustice.com post are:

---

[7] Even if the Court were to consider statements not set forth in the Amended Complaint that Plaintiff now alleges were defamatory, (*see* pages 11-12, *supra*), the Court's decision would be the same. The only additional statement from the second review cited by Defendant is the statement that "[t]he 'owner' has also advised my daughter by email that he and his partners would likely be suing both of us." (Doc. 163, p. 53.) Henley's email to Emily and Randy states that he is contacting his attorney and "we will pursue a lawsuit for libel and unfair competition" and later states: "Emily, you made inferences during our conversation that suggest you might have been the one to actually write and publish the libelous review. Thus, we may have to name you both in a suit initially until the court determines who is responsible. That's a legal question and attorneys will answer it." (Doc. 150-20, p. 1.) Thus, the review's statement is accurate. Moreover, Plaintiff did name Emily as a defendant in the lawsuit, so it is hard to see how Randy's statement can be defamatory.

- Plaintiff filed suit against Randy, Emily and Randy's business "for a review" Randy put on TripAdvisor,

- "That 'in violation of TripAdvisor policy . . . Emily received a call from someone saying they were the owner of Bigfoot on the Strip,'"

- Emily "spoke with the owner and informed him that she had nothing to do with the review and that he was violating TripAdvisor policy trying to contact" Randy,

- Defendants' "attorney sent a notice [on May 3] that we would offer to settle the matter to avoid costly litigation. There was no response," and

- "The suit is based upon unfounded accusations and meant merely to punish [Randy] for stating an opinion and some facts on the online website TripAdvisor."

(Doc. 65, ¶¶ 13-14.)

The first statement is true.[8] And, Plaintiff does not explain why it is false.

The second statement – that Plaintiff violated TripAdvisor's policies – must be read in context with the post's other statements reflecting (accurately) that Henley indicated that he would be filing suit against Defendants. This made the statement a combination of true facts and opinions. Calling a reviewer to insist on a change to the review and to warn that legal recourse will be taken can be construed as a "threat" because the reviewer will not change the review, which TripAdvisor's guidelines prohibit.

Plaintiff contends that the third statement is false. There is a factual dispute as to whether Emily told Henley that she and Randy jointly wrote the first TripAdvisor review; Henley testified that she did, and Emily testified that she did not. The Court must construe the dispute in Plaintiff's

---

[8] When the suit was first filed, "Dancing Cow Farms" was listed as a defendant. However, "Dancing Cow Farms" was just a fictitious name and thus incapable of being sued, and the Court dismissed "Dancing Cow Farms" on August 2, 2018. (Doc. 37.)

favor and for purposes of discussion accepts that Emily helped write the review and that she did not inform Henley that she had nothing to do with the review. Therefore, Randy's statement that she denied her involvement when talking with Henley is (for purposes of this discussion) false. Nonetheless, the Court does not see how this falsehood can be defamatory. Litigants frequently sue people and businesses who profess they have done nothing wrong, and this falsehood could not have harmed Plaintiff's reputation.

With respect to the fourth statement, the parties agree that Randy talked to his attorney before making this post and his attorney informed him that there was no response to the settlement offer made on May 3, and he did not learn that a response had been made until after he removed the post. (Doc. 163, pp. 26-27 (Plaintiff's response to Defendant's Statement of Fact Nos. 69 and 70).) Thus, the post was true when it was made, and while it "became" false Randy did not know that Plaintiff had responded to the settlement offer because his attorney was in the hospital and unable to keep up with emails. (Doc. 150-27, p. 1.) Thus, Randy lacked the necessary degree of fault to be liable for defamation. "The requisite degree of fault for a private figure . . . is negligence," *Overcast,* 11 S.W.3d at 70, and the facts demonstrate that Randy was not negligent given that (1) Randy checked with his attorney to ensure that the post was accurate on this point and (2) due to health reasons the attorney did not update Randy when the facts changed. Finally, the Court concludes that this statement could not be defamatory; even if the statement "Bigfoot on the Strip has not responded to our settlement offer" was false, it was not a falsehood that could damage Plaintiff's reputation or standing in the community.

Finally, Randy's statement that the lawsuit rested on "unfounded accusations" and was intended to "punish" Randy for his opinions about the tour are opinions that cannot support a

defamation claim. Otherwise, every defendant in every single case would be engaging in defamation.[9]

### *5. Emily's Statements to the Springfield News-Ledger*

As stated earlier, the newspaper article does not appear to be included in the Record. The Amended Complaint describes Emily as stating that (1) Randy wrote the review, not her, and (2) she did not know that Randy wrote a review until she received a call from Henley. (Doc. 65, ¶¶ 10-11.) Even if these statements are false, the Court concludes that they are not defamatory as a matter of law because they were not capable of damaging Plaintiff's standing or reputation in the community. To hold otherwise would mean that every litigant who denies her involvement in tortious conduct has defamed the plaintiff.

### B. Count II – Negligence

Count II alleges that Defendants "assumed a duty of care . . . to publish accurate and truthful information about Plaintiff" when they posted information in a review, granted interviews to the media, and otherwise published statements about Plaintiff. (Doc. 65, ¶ 27.) Count II then alleges that Defendants "breached the duty of care . . . when Defendants published a review of Plaintiff and Plaintiff's business containing inaccurate and false information, as detailed" elsewhere in the Amended Complaint. (Doc. 65, ¶ 28.) Defendants argue that these allegations can only be asserted as a defamation claim and cannot support a negligence claim, and the Court agrees.

---

[9] Even if the Court were to consider statements not set forth in the Amended Complaint that Plaintiff now alleges were defamatory, (*see* pages 11-12, *supra*), the Court's decision would be the same. Most of the additional statements are simply variations on the statements discussed in the text or have otherwise been addressed. In their Suggestions in Opposition, Plaintiff suggests that Randy's references to the suit as an example of "strategic litigation against public participation," or a SLAPP lawsuit, are defamatory, but these are opinion and not facts. Plaintiff's Suggestions in Opposition also suggest that Randy defamed it by stating that he responded to Asmussen's inquiries by explaining why he thought the review was honest and fair, and that Asmussen "replied in an email to me that she agreed." But, in fact, Asmussen responded to an email from Randy in which he explained his TripAdvisor post by stating: "understand where you are coming from." (Doc. 165-3, p. 1.)

Missouri courts have held that when a claim is premised on the publication of false statements, the claim must be for defamation and not some other tort. For instance, in *Hester v. Barnett,* 723 S.W.2d 544 (Mo. Ct. App. 1987), the plaintiffs asserted that the defendant made numerous false statements about them. The Missouri Court of Appeals held that those allegations could not support a claim for "extreme and outrageous conduct." The allegations about the "statements and publications . . . constitute *defamation,* and only defamation. '[A]ny action seeking damages for an untrue statement should be in libel.'" *Hester v. Barnett,* 723 S.W.2d 544, 561 (Mo. Ct. App. 1987) (quoting *Barber v. Time, Inc.,* 159 S.W.2d 291 (Mo. 1942)). Missouri courts have also held that claims predicated on the publication of untrue statements cannot support claims for invasion of privacy, *Henry v. Taft Television & Radio Co.,* 774 S.W.2d 889, 892 (Mo. Ct. App. 1989), intentional infliction of emotional distress, *Nazeri v. Missouri Valley Coll.,* 860 S.W.2d 303, 316 (Mo. 1993) (en banc), or prima facie tort. *Id.* And one federal judge applying Missouri law has relied on these cases to conclude that claims for negligently reporting false and injurious information "sound in defamation and thus do not provide a basis for recovery in negligence." *Monroe v. CMMG, Inc.,* 2015 WL 9581853, at *9 (W.D. Mo. Dec. 30, 2015).

Plaintiff does not disagree with these principles. Instead, it contends that they do not apply because it is alleging a breach of a duty imposed by TripAdvisor's Terms of Service, which require reviewers to post truthful information. Assuming this is an accurate description of the Terms of Service, and assuming the Terms of Service create a legally enforceable duty, Plaintiff's argument does not account for the fact that its claim is still seeking damages for allegedly untrue statements – which Missouri law provides must be asserted in a defamation claim. There is no authority

establishing that the nature or source of the duty matters. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim that they negligently published false information.[10]

### C. Count IV – Tortious Interference With Business Expectancy

The Amended Complaint alleges that Defendants tortiously interfered with Plaintiff's business expectancies with potential customers. (Doc. 65, ¶¶ 36-39.) The elements of this tort are: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Western Blue Print Co., LLC v. Roberts,* 367 S.W.3d 7, 19 (Mo. 2012) (en banc). The Court agrees with Defendants that the Record demonstrates Plaintiff is unable to establish the fourth element (making it unnecessary to address Plaintiff's arguments regarding the fifth element).

As a part of proving that the defendant acted without justification, a plaintiff must also demonstrate that the defendant utilized improper means. *E.g., Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 252 (Mo. 2006) (en banc) ("the plaintiff must show that the defendant employed improper means in seeking to further only his own interests"); *Others First,* 829 F.3d at 579 ("To show an absence of justification, [the plaintiff] has the burden of producing sufficient evidence to show that the [defendant] employed improper means to further its own interest"); *see also Clinch,* 187 S.W.3d at 16-17 (discussing evolution of Missouri law). "Improper means are those that are

---

[10] In its Suggestions in Opposition, Plaintiff contends that its negligence claim is also premised on the violation of other provisions of TripAdvisor's Terms of Service, such as those allegedly discouraging reviewers from posting reviews about business competitors. The Court doubts that the parties are business competitors given that Defendants do not offer opportunities to play miniature golf, play arcade games, and participate in other interactive experiences, and are located approximately 240 miles from Plaintiff. The Court also doubts that TripAdvisor's Terms of Service qualify as the basis for a legal duty owed to Plaintiff that Plaintiff can enforce through litigation. Regardless, the Court need not delve into these matters because Count II does not allege that Defendants were negligent for violating these provisions of TripAdvisor's Terms of Services.

Case 6:18-cv-03155-BP   Document 170   Filed 08/30/19   Page 20 of 21

independently wrongful, such as threats, violence, trespass, *defamation*, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Western Blue Print,* 367 S.W.3d at 20 (quotation omitted; emphasis supplied). Here, the allegedly "improper means" are Plaintiff's claims of defamation. But, "where a tortious interference claim is based upon an alleged defamation, if a plaintiff's defamation claim fails, the tortious interference claim must also fail because the plaintiff cannot establish an absence of justification as a matter of law." *Castle Rock,* 354 S.W.3d at 245; *see also Others First,* 829 F.3d at 579-80. Given that the Court has granted summary judgment on Plaintiff's defamation claim, it must also grant summary judgment on Plaintiff's tortious interference claim.

### III. CONCLUSION

For the reasons stated above, the Court grants summary judgment on Counts I, II and IV. And, with no substantive claims remaining, the Court also grants summary judgment on the Counts III and V because they only seek relief for the causes of action asserted in Counts I, II and IV. Therefore, summary judgment is granted to Defendants on all of Plaintiff's claims.

**IT IS SO ORDERED.**


/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
Date: August 30, 2019          UNITED STATES DISTRICT COURT

21